STATE of South Dakota, Plaintiff
and Respondent,

v.

Benny IRON THUNDER, Defendant
and Appellant.

No. 12368.

Supreme Court of South Dakota.

Argued Sept. 15, 1978.

Decided Dec. 7, 1978.

John P. Guhin, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on brief.

John T. Hughes, Sturgis, for defendant and appellant.

MORGAN, Justice.

This is an appeal from the Eighth Judicial Circuit of a conviction for rape and second-degree burglary. Defendant appeals on two principal grounds: (1) The trial court's denial of a motion to suppress an allegedly suggestive photographic lineup and the subsequent in-court identification; and (2) the trial court's failure to either dismiss the case or strike the testimony of two key prosecution witnesses, both of whom invoked the Fifth Amendment during cross-examination. We affirm the conviction.

In the early morning hours of May 27, 1977, at approximately 5:00 a. m., defendant went to the Belle Fourche home of a 70-year-old widow, broke in through a window, and raped her. The victim immediately went to the house of her niece and nephew nearby, and, after having told her niece and nephew what had happened, the police were called.

The Butte County Sheriff and the Belle Fourche Chief of Police arrived shortly and talked to the victim. She gave a description of the rapist as "rather large and dark complected with a large round stomach" and having a wide gap between his teeth. Another officer recognized the description as fitting defendant, Benny Iron Thunder, with whom he had come into contact the previous evening.

Upon determining that Iron Thunder was a suspect, the sheriff, the chief and another officer went to the home of defendant's mother, which was adjacent to the victim's home, to check on defendant's whereabouts. They were told that defendant was sleeping in the van in front of the house. The officers then went to the van, woke defendant, and asked him a few questions. It is unclear whether defendant had been read his *Miranda* rights at this point. Defendant was then taken to the police station and his *Miranda* rights were read to him. Some pictures were taken of defendant and he was allowed to rest.

At approximately 9:00 a. m., the sheriff and chief of police took the pictures of defendant, along with six other pictures selected from the police files, and showed them to the victim who readily identified defendant as the man who had raped her.

Shortly thereafter, defendant, after again having been read his *Miranda* rights, told the police that he had broken into the house and raped "the lady in there". He then wrote out and signed a statement to that effect.

Following a preliminary hearing, defendant was bound over for trial. Defendant then filed a motion to suppress the photographic lineup and his confession. A suppression hearing was held and defendant's motions were denied.

On the day before the trial, the state's attorney was told by the chief of police that certain statements he and the sheriff had made at the suppression hearing with respect to the events which took place at the van were incorrect. It appears that the incorrect statements were those concerning whether, and when, defendant was read his *Miranda* rights. The state's attorney immediately contacted the trial court and defendant's counsel and informed them of what the chief of police had told him.

Various motions were made and, following a continuance, the trial court ordered that the prosecution not be allowed to present any evidence or elicit any testimony on direct examination concerning the events or conversations which occurred at the van. Defense counsel, however, was not prevented from going into said events or conversations on cross-examination. However, at trial, when defense counsel cross-examined the chief of police and the sheriff as to events and conversations at the van, both witnesses refused to answer, invoking their rights under the Fifth Amendment to the United States Constitution.

Defendant was found guilty by the jury of rape and second-degree burglary and was sentenced to fifteen years and ten years on the respective counts, to be served concurrently.

The first issue presented is whether the photographic lineup from which the victim first identified the defendant was impermissibly suggestive and, if it was, whether the victim's subsequent in-court identification at the trial was tainted by the impermissibly suggestive photographic lineup.

 It is well settled that in-court identifications are not admissible at trial when they stem from a photographic identification lineup procedure that is so impermissibly suggestive as to result in a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *State v. Barcley*, S.D., 225 N.W.2d 875 (1975); *State v. Sahlie*, S.D., 245 N.W.2d 476 (1976). The burden of establishing the impermissible suggestiveness of the photographic lineup is upon the party seeking to suppress the evidence. *State v. Barcley*, supra.

 However, even though the photographic lineup may be considered to be impermissibly suggestive, the in-court identification is admissible upon the state's showing, by clear and convincing proof, that the in-court identification had an independent origin, i. e., based upon observation of the suspect by the witness other than the photographs shown to the witness. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *State v. Sahlie*, supra.

The initial determination to be made is whether the photographic lineup was impermissibly suggestive. There seem to be three areas of attack as to the suggestiveness: (1) The fact that one picture shows the bare chest and stomach of defendant and that in the picture showing defendant's face, his shirt is partially open at the collar; (2) the fact that defendant is the only individual not having an identification board hanging around his neck; and (3) the allegation that the individuals in the other photographs do not sufficiently resemble defendant.

 This determination is, to a great extent, a subjective one. It appears to this court that the photographic lineup was impermissibly suggestive in the first two respects. While the array of photographs did not all look alike with respect to the resemblance of the subjects, the fact that there was one photograph of only the bare chest and stomach of an unidentified subject, coupled with the fact that defendant's photograph showed a shirt partly open at the collar, strongly suggested a link between the two. Since the victim had particularly commented on the rapist's big belly in her initial interview, there can be no question that the inclusion of the single torso shot was an attempt to suggest identification. Furthermore, displaying five photos of subjects with identification boards and one without impermissibly suggests which is the current suspect. In photographing defendant for the obvious purpose of identification, the officers could have used an identification board or in the alternative, when displaying the photographs, identification boards could have been trimmed from the other photographs.

Having determined that the photographic identification was impermissibly suggestive, we must then consider whether the in-court identification by the victim had an independent origin.

This court has on two previous occasions dealt with the problem of proving independent origin for identification in situations where the lineup procedures were not deemed proper. In *State v. Keeling*, S.D., 233 N.W.2d 586 (1975), this court faced the problem for the first time. In that case, although defendant had been subjected to an improper lineup procedure, which this court condemned, it was ruled that the in-court identifications of defendant by the witnesses were not so tainted by the improper procedures so as to make the in-court identifications inadmissible. In so ruling, this court followed the analysis of the United States Supreme Court in *United States v. Wade*, supra, where the court found that the question of whether the in-court identification was "purged" of the taint required

> consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup. 388 U.S. at 241, 87 S.Ct. at 1940, 18 L.Ed.2d at 1165.

See also *State v. Sahlie*, supra, at pages 479–480.

Keeping those guidelines in mind, we next examine the record before us to determine whether the in-court identification had an independent origin.

■ Examination of the record discloses ample evidence of the independent origin of the victim's identification of defendant so as to purge the taint:

(1) her initial description was so accurate that an investigating officer recognized it to be defendant;

(2) prior to the incident, defendant was unknown to her;

(3) her in-court testimony that she would recognize him out of a hundred people;

(4) although lighting conditions were so poor that she made no observation as to race or skin color, she did describe a detailed condition, which was a gap in the rapist's teeth identical to defendant's;

(5) she disclaimed that the torso photo was helpful in the photo lineup.

We therefore hold that the in-court identification was purged of the taint of the suggestive photographic lineup.

Defendant's next contention is that the trial court erred in not granting defendant's motion to dismiss or, alternatively, in not striking the entire testimony of the chief of police and the sheriff due to their refusal to answer, on Fifth Amendment grounds, questions on cross-examination dealing with events and conversations which took place at the van when contact was first made with defendant. Defendant contends that he was prejudiced by their refusal to answer said questions and that, as a result of their refusal to answer his questions, all of their testimony should have been stricken.

■ The record discloses, however, that defendant did not, at any time, move to strike the testimony of the chief of police or the sheriff. Therefore, it would appear that his motion to strike their testimony is not properly before this court.[1]

■ Defendant did, however, file a motion for a new trial approximately one month after the trial, stating as one of the reasons, his contention that the failure of the chief of police and sheriff to answer all his questions denied defendant a fair trial. That motion was denied and is thus properly before us.[2]

■ Three considerations merit attention. First, did the witnesses' refusals prevent defendant from inquiring into any matter testified to on direct examination or

---

1. SDCL 15–6–59(a)(7); *Stark v. Stark*, 79 S.D. 178, 109 N.W.2d 904 (1961).

2. *Brown v. Wisconsin Granite Co.*, 47 S.D. 635, 201 N.W. 555 (1924).

otherwise admitted into evidence? The answer is "no," since the trial court prohibited the state from eliciting such testimony or presenting such evidence.

Second, did their refusals prevent defendant from presenting testimony or evidence which would show a violation of his rights or tend to exculpate defendant? The answer, again, is "no." If the officers had been forced to answer the questions, the only information gained may have been whether defendant was read his *Miranda* rights before any questions were asked. However, since no statement or action of defendant during the time period in question was used at the trial, he was not prejudiced.

Finally, did their refusals prevent defendant from presenting to the jury evidence affecting the credibility of those witnesses? The answer here is probably "yes." Had they been forced to answer defendant's questions, the fact that they made some incorrect statements at the suppression hearing would likely have been elicited. However, the record shows that defendant got more "mileage" out of their refusal to answer in the course of his arguments than he probably would have from admissions. We must consider, however, whether defendant's inability to attack the witness's credibility prejudiced his Sixth Amendment rights. In the landmark case of *United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963), the court stated:

> In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's

testimony may be used against him. (Citations omitted.) On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part. 316 F.2d at 611.

See also *United States v. Newman*, 490 F.2d 139 (3d Cir. 1974); *United States v. Stephens*, 492 F.2d 1367 (6th Cir. 1974). Also, in *United States v. Rogers*, 475 F.2d 821 (7th Cir. 1973), the court quotes from *Fountain v. United States*, 384 F.2d 624 (5th Cir. 1967) as follows:

> [T]he line between 'direct' and 'collateral' is not clear, and the question in each case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony. 384 F.2d at 628.

In this case, as previously stated, the precluded inquiry concerned only the credibility of the witnesses, not the truth of any direct testimony. Thus, defendant has suffered no prejudice.

■ A third issue raised by defendant on appeal is that the facts of this case in their totality indicate that the written and oral statements taken from defendant were obtained through violation of his Fourteenth Amendment right to due process of law. We see no merit in this argument and defendant cites no persuasive authority for his contention.

We affirm the conviction.

All the Justices concur.